AETNA CASUALTY & SURETY COMPANY ET AL V. TOM LOVE ET AL.

No. 7216. Decided December 7, 1938.
Rehearing overruled January 18, 1939.
(121 S. W., 2d Series, 986.)

*Johnston, Rogers & Slatton,* of San Antonio, for plaintiff in error.

The local claim adjuster, not having authority from the insurance company to request any one to order or perform an autopsy, such act on his part was outside of the scope of his employment and would not render the insurance company liable for such wrongful autopsy. Genovese v. Butt (Com. App.) 48 S. W. (2d) 587; Mayes v. International & G. N. Ry. Co., v. Anderson, 82 Texas 516, 17 S. W. 1039.

*Harry B. Berry,* of Kerrville, for defendant in error.

The fact that the representative of an insurance carrier of the decedent's employer communicated only fairly and truthfully to a justice of the peace such facts surrounding the employee's death which would warrant the issuance of an order for an inquest on his dead body, standing alone, will not serve to relieve the insurance company of liability, where it is not asserted that the communication of said facts to the magistrate was done in good faith. Sebastian v. Cheney, 86 Texas 497, 25 S. W. 691; Igoe v. Peinado, 54 S. W. (2d) 556; Speer v. Allen, 135 S. W. 231.

MR. PRESIDING JUDGE HARVEY delivered the opinion of the Commission of Appeals, Section A.

This suit was instituted by Tom Love, and his two sisters, Victoria Houston (a feme sole) and Cora Davis (a feme sole) against Aetna Casualty & Surety Company and Aetna Life Insurance Company, for damages on account of the wrongful dissection and mutilation of the dead body of Orange Love, their brother. The nearest relatives of Orange Love, at the time of his death, were the plaintiffs and a brother, Jim Love, who died a short time later. It is alleged that the defendant unlawfully procured an autopsy on the dead body and that the body was dissected and mutilated in the conducting of the autopsy. The Aetna Casualty & Surety Company was later dismissed and the case against the Aetna Life Insurance Company proceeded to trial. The trial was before a jury, but at the conclusion of the testimony, the trial court instructed the jury to return a verdict for the Insurance Company, and judgment was entered accordingly. Tom Love and his sisters appealed to the Court of Civil Appeals and that court entered judgment reversing the judgment of the trial court and remanding the cause. (99 S. W. (2d) 646.) The Insurance Company applied for the writ of error which was granted.

It appears in testimony that the Insurance Company was the carrier of Workmen's Compensation Insurance for the San Antonio Compress Company. On June 12, 1933, Orange Love duly presented to the San Antonio Compress Company, as provided by the Workmen's Compensation Law, a claim for compensation because of certain specified bodily injuries alleged by him to have been received in lifting a bale of cotton, at the Compress Company's plant, on October 15, 1932, in the course of his employment with the Compress Company. He also filed a copy of said claim with the Industrial Accident Board. Thereafter, on June 15, 1933, Orange Love died in San Antonio and his dead body was sent to a negro funeral parlor in San An-

tonio, where it remained pending the arrangements for the funeral which occurred on June 25, 1933. In the meantime, on June 21, 1933, Tom Love and his two sisters duly presented to the Compress Company their claim for compensation on account of the death of their brother, Orange Love; and also a few days later filed a copy of said claim with the Industrial Accident Board. The injuries alleged in this last mentioned claim, as causing the death of Orange Love, were the same as those which the latter had alleged in the claim made by him. On June 22, 1933, the dead body of Orange Love still being at the said funeral parlor, Judge Shook, a justice of the peace at San·Antonio, telephoned Dr. Goodson, the County Health Officer of Bexar County, and ordered him to make an autopsy of the dead body. Dr. Goodson, in pursuance of said order, proceeded on the same day, with the assistance of Dr. Stout, to perform the autopsy. In performing the autopsy these doctors cut open the dead body at various places and removed therefrom, for the purpose of examination, various bodily organs. They found that Orange Love had received no bodily injuries at all, from violence to his person, but that his death was caused by chronic glomerular nephrites.

In respect to the matter of liability of the Insurance Company for damages, the Company, in its application for the writ of error, presents a group of assignments of error which relate to the action of the justice of the peace in ordering the autopsy. The gist of these several assignments is to the effect that the testimony conclusively shows that the Insurance Company is not responsible for the act of the justice of the peace in ordering the autopsy. In this connection, it is contended that the evidence shows conclusively that C. E. Klein, the claim adjuster for the Insurance Company, did not wrongfully procure the autopsy order since the undisputed testimony of Klein shows that the latter simply laid before the justice of the peace a full, fair and truthful statement of all the facts concerning the cause of the death of Orange Love, so far as same had come to the knowledge of Klein in making investigation of the compensation claim which had been made, and that the ordering of the autopsy was left by him entirely to the discretion of the justice of the peace. The only testimony bearing on this subject, which appears in the record, is that of Klein himself. Except by the presumption of regularity of the action of the justice of the peace in making the autopsy order, the cause of that officer's action, and the circumstances in respect to which he acted, appear from the testimony of Klein alone. The lat-

ter's testimony in this respect is set out below:

"I said I went to the Justice of the Peace about this matter. I went to him to give him the information that our investigation had disclosed. As to what investigation I made, the man (meaning Orange Love) alleged that he had sustained an injury on a certain date, and the investigation did not even disclose that he had been working there at that time on that day, or that he had ever received an injury there. They were claiming that he died as a result of the injuries and our investigation did not disclose that he got hurt at the plant. I went to the justice of the peace to give him the information I had. At the time I laid the facts before the Justice of the Peace I did not know what the result would be. As to whether or not I went to the Justice of the Peace to disprove the facts, I just stated I was interested in the facts in this compensation claim. The purpose I had in mind when I went to the office of Judge Shook, the Justice of the Peace, was to acertain the facts. I knew the facts as our investigation disclosed, but I was interested as a citizen or individual would be to determine the cause of this man's death. I said I went there as a citizen would, but is was in the course of my work. I went there, as a citizen would, to lay before the Justice of the Peace the facts, because we were interested in determining the cause of this man's death. I left my office in the Chandler Building and came over to the Court House and laid before Judge Shook the fact that the man had died, and the other facts in connection with it; all the information we had; that he had claimed he had received an injury there, and that he had died as the result of the injury, and we were not able to find that he had been hurt out there at the plant. I never did request an autopsy from Judge Shook. * * * I did not want an autopsy unless Judge Shook ordered it. * * * I gave Judge Shook all the information I had regarding this man's claim and what our investigation disclosed; that he claimed that he had sustained an injury while in the course of his work; as well as I remember, he claimed some lick to his abdominal region, and the investigation disclosed that he had not been at work for a week or two from the time he claimed he was hurt, in talking to various workmen—and he made no complaint and reported no accident or injury on that date. I said that it was claimed that his death was the result of the accident and we were interested in determining whether it was. I gave those facts to Judge Shook and he ordered the autopsy. I never asked Judge Shook for an autopsy at all. * * * I did not tell or request Judge Shook to call Dr. Goodson. * * * I picked up the phone and

called Dr. Goodson in Judge Shook's office at Judge Shook's request. I called him on the phone and then handed the phone over to Judge Shook. * * * When I saw Judge Shook, I saw him in behalf of the Aetna Life Insurance Company. I did not see Dr. Goodson at all. I saw Judge Shook and laid before him the facts as we had them. * * * I laid the facts before the justice of the peace, Shook, and he ordered the autopsy. That is my connection with it. I heard him order the autopsy over the telephone. I was sitting in the office and heard him talking * * * I said I went to Judge Shook and stated the facts before this autopsy was performed and he ordered it performed. As to what I stated to Judge Shook, I told him that it had been claimed that this man's death was the result of an injury or some kind of a blow to his abdominal region that he had received some nine months ago; that we had investigated the case carefully, we had interviewed all of his former fellow workmen and his bosses and straw bosses, and could not find that he had ever received any injury out there, and that if he did die of some blow or injury that we were reasonably certain that it did not occur out there. There was some question as to what this man did die from; he died under mysterious circumstances, and we could not verify his contention that he made before the Board that he had been injured out there, and the man's death had been sudden. I stated all these facts to him. Judge Shook said that it was a case to be investigated. * * * Personally myself, or my company, had no interest in it (the autopsy) at all other than that that arose from the claim in Austin. * * * I gave Judge Shook all the facts we had, just submitted it to him and he drew his own—or he came to his own conclusion. I had no authority—I was agent— to go out and perform autopsies or authorize anybody else to do it."

Before announcing our conclusion in respect to the contention that the foregoing testimony of Klein shows, conclusively, that he did not wrongfully procure the autopsy order, we deem it proper to examine the statutes bearing on the subject. These statutes consist of the following articles of the Code of Criminal Procedure:

"Art. 968. Any justice of the peace shall be authorized, and it shall be his duty, to hold inquests without a jury within his county, in the following cases:

"1. When a person dies in prison.
"2. When any person is killed, or from any cause dies an

unnatural death, except under sentence of the law, or in the absence of one or more good witnesses.

"3. When the body of a human being is found, and the circumstances of his death are unknown.

"4. When the circumstances of the death of any person are such as to lead to suspicion that he came to his death by unlawful means."

"Art. 970. Upon an inquest held to ascertain the cause of death the justice shall, if he deems it necessary, call in the county health officer, or, if there be none, or if it be impracticable to secure his services, then some regular physician, to make an autopsy in order to determine whether the death was occasioned by violence; and if so, its nature and character. The county in which such inquest and autopsy is held shall pay to the physician making such autopsy a fee of not less than ten nor more than fifty dollars, the excess over ten dollars to be determined by the commissioners court after ascertaining the amount and nature of the work performed in making such autopsy."

"Art. 972. The justice shall act in such cases upon information given him by any credible person or upon facts within his own knowledge."

■ The authority of a justice of the peace to order an autopsy is derived exclusively from Article 970, and the sole purpose for which such authority may be lawfully exercised by that officer is the detection of crime. Polk County v. Phillips, 92 Texas 630, 51 S. W. 328. It reasonably appears, too, that this statute (Article 970) contemplates that the justice of the peace, in reaching the conclusion that an autopsy is necessary, shall be governed in every case by the provisions of Article 972 and subdivision 4 of Article 968. It is to be remembered, however, that the act of the justice of the peace in ordering an autopsy is an official act, consequently whenever he orders an autopsy the presumption attaches that his act is the result of the due exercise of the authority conferred by the statute in conformity with the statutory regulations. In a word, it is to be presumed that in ordering the autopsy he acted in the exercise of sound discretion—which of course, embraces good faith—for the purpose of detecting crime. This presumption, however, is rebuttable and may be overcome by countervailing testimony.

Taking up for examination the testimony of Klein hereinabove set out, it is noticed that Klein did not, in terms, request the justice of the peace to order the autopsy involved in this controversy. But this fact loses importance in the light of his

other testimnoy which discloses the circumstances attending the act of the justice of the peace in ordering the autopsy. The testimony of Klein in this respect is such as to have justified the jury in deducting therefrom the following facts: (1) That the object of Klein, in laying the facts before the justice of the peace as he did, was to induce that officer to order the autopsy for the purpose of discovering whether or not Orange Love had received the injuries in respect to which compensation was claimed; (2) that the justice of the peace ordered the autopsy for such purpose. Fact findings to this effect by the jury would have destroyed the presumption of regularity which bolsters the autopsy order, and the fact would be established that, at the investigation of Klein, the justice of the peace ordered the autopsy for a purpose not authorized by law.

All the other assignments relating to the question of liability which are contained in the application for the writ of error, concern Klein's authority as the agent of the Insurance Company. In this connection, the main contention is to the effect that Klein, in procuring the autopsy order as he did, was not acting within the scope of his authority. There is testimony contained in the record, which need not be set out here, to the effect that Klein, as claim adjuster for the Company, has general authority to investigate any claim for compensation in any case where the Insurance Company is the insurer under the Workmen's Compensation Law, and to ascertain whether or not the injuries, in respect to which such claim is made, were received by the alleged injured employee. The testimony of Klein hereinabove set out tends to show, as we have already pointed out, that his object, in instigating the autopsy order, was to discover, by means of the autopsy, whether or not Orange Love had received the injuries alleged in the compensation claim. It is settled law, that a principal is responsible for an unlawful act of his agent where same is committed by the agent for the purpose of accomplishing the mission intrusted to him by his principal. Magnolia Petroleum Company v. Guffey, 129 Texas 293, 102 S. W. (2d) 408.

The judgment of the Court of Civil Appeals, reversing the judgment of the trial court and remanding the cause, is affirmed.

Opinion adopted by the Supreme Court, December 7, 1938.

Rehearing overruled January 18, 1939.